## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| QSR Steel Corporation, LLC, | Case No. 24-20562 (JJT) |
| Debtor. | Re: ECF Nos. 117, 146, 148, 238 |

## MEMORANDUM OF DECISION AND ORDER GRANTING
## MOTION TO APPROVE SETTLEMENT AGREEMENT

Before the Court is the Debtor's Motion to Approve Settlement Agreement (ECF No. 117). Objections were filed by Haynes Construction Company (Haynes, ECF No. 148), as well as the Subchapter V Trustee (ECF No. 146). The Court held a hearing on the Motion on September 26, 2024, at which time the Debtor sought a continuation of its scheduled hearing. After a status conference on November 7, 2024, the Court held an evidentiary hearing on the Motion on November 27, 2024, at which counsel appeared for the Debtor, Glenn Salamone (the Debtor's President and one of its principals), the Subchapter V Trustee, and counsel for the United States Trustee, Haynes, Nosal Builders, Inc. (Nosal), and SwissRe Corporation Solutions America Insurance Corporation f/k/a North American Specialty Insurance Co. (NAS).[1]

For the following reasons, the Court approves the Settlement Agreement and the Motion to Approve Settlement Agreement is therefore granted and its due

---

[1] At the evidentiary hearing, the Court took judicial notice of two related lawsuits: *Nosal Builders, Inc. v. QSR Steel Corp. et al.*, HHD-CV21-6148623-S (Conn. Super. Ct.); *N. Am. Specialty Ins. Co. v. QSR Steel Corp. LLC et al.*, 3:21-cv-00247-SVN (D. Conn. Sept. 19, 2022).

performance by the Debtor and parties is directed and authorized. Its consummation will resolve multiple layers of costly, uncertain, and tangled litigation, which otherwise would virtually assure the Debtor's liquidation and no meaningful recovery for creditors of this bankruptcy estate.

## 1. Background

The Debtor is a structural steel company owned and operated by Glenn Salamone and David Rusconi. On or about June 13, 2019, the Connecticut Department of Transportation and Nosal, which is a construction management and general contracting corporation, entered into an agreement pertaining to a commercial construction project in East Hampton and Marlborough, Connecticut. On or about August 8, 2019, Nosal and the Debtor entered into a subcontract with respect to the construction project, under which Nosal retained the Debtor as a subcontractor to perform certain tasks, including the fabrication and installation of steel and metal work. At the Debtor's request, NAS issued a performance bond guaranteeing performance of the subcontract and another performance bond for the benefit of the Debtor's subcontractors and suppliers. Each bond was in the penal sum of $710,000 for the construction project. On or about July 2020, Nosal terminated the subcontract based upon a claimed breach of the subcontract by the Debtor and made a claim against NAS under the bonds. NAS then took over the Debtor's work on the project, but retained the Debtor as its subcontractor. After what Nosal claims was the deficient work by NAS (through the Debtor), Nosal obtained additional contractors to complete the work on the project.

In February 2021, NAS brought a complaint against the Debtor and related entities in the District Court for the District of Connecticut, alleging that the Debtor and related entities breached a general agreement of indemnity entered into as a condition of issuing the performance bonds. Eventually, summary judgment was granted in favor of NAS on its breach of contract claim based upon the Debtor's failure to indemnify it, with an amended judgment in the amount of $201,975.12 entering on January 19, 2024.[2]

Meanwhile, on or about October 26, 2021, Nosal also commenced an action against both the Debtor and NAS in the Connecticut Superior Court, alleging that the Debtor breached the subcontract and that NAS breached the performance bond. The Debtor filed counterclaims against Nosal in the same action for wrongful termination of the subcontract and breach of the subcontract, the second premised on alleged disputes over change orders. After years of litigation, the three parties— the Debtor, Nosal, and NAS—agreed to a settlement that was privately mediated on April 29, 2024. The settlement (Settlement Agreement, Ex. 2) was heavily negotiated by the parties and thereafter memorialized in a document that was definitive with respect to the Debtor and Nosal, but was subject to NAS finetuning releases reserving its rights in its dispute with Nosal.[3] In contemplation of the immediate closing of the Settlement Agreement, the Debtor transferred $150,000.00

---

[2] According to NAS's proof of claim for $227,820.64, the District Court judgment was paid and is not included the amounts NAS now claims from the Debtor, which instead consists of alleged legal and consulting expenses incurred. POC 27-1.

[3] The Debtor reported to the Superior Court that a tentative settlement was reach, but that there were "disagreements regarding material terms with respect to the release." As noted directly below, those issues with the releases were resolved by the petition date and, in any event, pertained only to releases between Nosal and NAS.

of its funds to its legal counsel on May 3, 2024. The undisputed record evidences that the money was to be held in escrow pending the execution and delivery of the Settlement Agreement.

After the mediation concluded, NAS's counsel modestly revised the language of those certain release provisions in the final draft of the Settlement Agreement pertaining to its claims against Nosal. Nosal and the Debtor accepted those revisions and NAS's counsel recommended that its client accept those revisions, as well. NAS, however, did not communicate its final formal assent to the agreement, as revised by its own counsel, before the Debtor filed the instant bankruptcy case on under Subchapter V of Chapter 11 on June 18, 2024. At that time, the substantive terms were fully agreed upon and only NAS's final confirmation of the release language and the Settlement Agreement's written execution remained.[4]

On August 23, 2024, the Debtor filed its Motion to Approve Settlement Agreement (ECF No. 117). Therein, the Debtor argued that the "settlement was effectively consummated pre-petition" and constituted "an enforceable pre-petition settlement agreement that would not otherwise require Bankruptcy Court approval" to validate its effectiveness. In support of its argument, the Debtor notes that "[t]he only ministerial acts that remained where the exchange of the signed settlement documents and the release of the [money held in escrow]." Alternatively, should this Court disagree that the Settlement Agreement was effectively

---

[4] Nosal filed its proof of claim on August 19, 2024, claiming $799,472.57 for its claims related to breach of the subcontract. POC 24-1.

4

consummated prepetition, the Debtor asserts that "the Settlement is in the best interests of creditors and the estate and should be approved as reasonable."[5]

On September 19, 2024, the Subchapter V Trustee filed his objection, airing concerns about the settlement's propriety, enforceability, and compliance with Bankruptcy Code priorities. The Subchapter V Trustee first noted that the funds held in escrow did not appear to be subject to any grant of any security interest. Second, the Subchapter V Trustee asserted that, assuming the Settlement Agreement was executed, it constituted a prepetition contract creating a mere prepetition debt and that this resulting debt should be treated like and accorded the priority of other prepetition debt under a plan of reorganization. The Subchapter V Trustee, however, later withdrew his objection on the record at the evidentiary hearing held on November 27, 2024, after his further examination and weighing of the material facts and circumstances delineated herein, particularly the history and definiteness of the settlement, and its significance to the prospects of any plan of reorganization.

Also on September 19, 2024, Haynes filed its objection, arguing that to permit the settlement would effectively allow a preference payment to Nosal in violation of 11 U.S.C. §§ 547 and 1122. Haynes contends that the settlement should not be honored and that the parties to that settlement "should be paid equally with other

---

[5] The Debtor has also intimated in prior proceedings before this Court that the Settlement Agreement may qualify as an executory contract that it could assume under 11 U.S.C. § 365. Given the disposition below, the Court need not consider this argument in this Memorandum.

[prepetition general] unsecured creditors in the Debtor's [proposed] Chapter 11 plan of reorganization." *See also* ECF No. 184 (proposed Chapter 11 Plan).

No other party in interest, including the U.S. Trustee, filed or interposed any objection.

At the November 27, 2024 hearing, only the Debtor advanced any evidence, while Haynes essentially rested on its legal arguments. The Debtor's first witness was Glenn Salamone, the Debtor's President and one of its principals. Salamone credibly testified about his knowledge and the merits of the ongoing litigation against the Debtor in the Superior Court of Connecticut pertaining to the Debtor's contentious dispute with NAS and Nosal and the centrality of its resolution to the preservation and reorganization of his business. He had participated with counsel at the mediation on April 29, 2024. Salamone unequivocally testified that once the mediation concluded on that date, the representatives of the three parties shook hands and reported to the mediator that the matter was concluded. He then arranged for the immediate funding and closing of that resolution. Unchallenged, he credibly testified that the settlement was intended by the Debtor and Nosal to be definitive, notwithstanding the anticipated finetuning of the NAS releases in the Settlement Agreement. The only detail left to be refined was the form of those releases, which preserved unrelated claims that NAS may have had.

The Debtor's second witness was Michael Shoff, who is employed by Marcum LLP, which is now a part of CBIZ Advisory Services, where he is a director in the firm's Financial Accounting and Advisory Services practice and is a certified public

accountant. The Debtor moved for Shoff to be recognized as an expert financial advisory witness without objection, which the Court granted on the record due to Shoff's experience and knowledge of the Debtor's financials. Shoff opined on the Debtor's current and projected financial performance. In addressing the projections for a proposed Chapter 11 plan, Shoff noted Haynes potential recovery under three scenarios in Exhibit 3: (1) no settlement approval and no related expenses, (2) settlement approval, and (3) no settlement approval but $75,000 of legal expenses.[6] As explained by Shoff, the first scenario would lead to an approximately 17% recovery for Haynes, the second scenario would lead to a slightly lower 17% recovery,[7] and the third would lead to a 16% recovery.[8] He also testified that, should the bankruptcy case convert to Chapter 7, the nature of the Debtor's business would likely lead to no recovery for unsecured creditors. In that record, the risks and costs of the litigation alone could destroy the Debtor's ability to operate and reorganize. The Court credits his unrebutted testimony.

Although counsel for NAS and Nosal appeared, neither party objected to the Court's settlement's approval. Conversely, Nosal expressed its desire for the settlement to be approved, as did the Subchapter V Trustee and the U.S. Trustee.

---

[6] In particular, Exhibit 3, as explained by Shoff, projects that legal fees associated with continued litigation with Nosal would result in *less* of a recovery for Haynes than if the Court were to approve the settlement.

[7] The difference between the first and second scenarios for Haynes is $7,435, an amount the Court finds to be de minimis.

[8] The scenarios in which the Settlement Agreement presume that Nosal's claim would be paid pro rata based upon its $799,472.57 claim, without accounting for any increases that might enhance the claim. Nosal's claim under the three scenarios noted would be paid at the rate of 17%, 19%, and 16%, respectively. Under those projections, Nosal would recover $136,297, $150,000 (the settlement), or $125,689.

At the conclusion of the hearing and final arguments, the Court took the matter under advisement to facilitate its deliberations. On December 13, 2024, the Court entered an Interim Order Granting Motion to Approve Settlement Agreement and Related Relief (ECF No. 238), which was done to address a disposition on a certain motion for relief from stay (ECF No. 206) before a statutory deadline for a decision. In the Interim Order, the Court indicated that the Motion to Approve Settlement Agreement was granted on an interim basis, but that a Memorandum of Decision would follow. (ECF No. 238). This is that Memorandum of Decision.

## 2. Jurisdiction

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

## 3. Discussion

### 3.1    The Settlement Agreement was an enforceable prepetition agreement.

Before addressing whether the prepetition Settlement Agreement can be enforced and closed by the Debtor postpetition, the Court must first consider the threshold issue of whether the Settlement Agreement was enforceable.

"Under Connecticut law the proponent of a contract must prove the existence of a valid agreement by a preponderance of the evidence." *Omega*, 432 F.3d at 444. Accordingly, the Debtor bears the burden of proving that an enforceable Settlement Agreement existed prepetition.

"Under Connecticut law, the enforceability of a settlement agreement is determined using general principles of contract law." *Lassen v. Hoyt Livery, Inc.*, No. 3:13-cv-1529 (VAB), 2018 WL 6313184 at *2 (D. Conn. Dec. 3, 2018). In Connecticut, "[a] contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relationship." *Klein v. Chatfield*, 166 Conn. 76, 80, 347 A.2d 58 (1974). "The existence of [that] contract is a question of fact to be determined by the trier on the basis of all the evidence. To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists." *Johnson v. Schmitz*, 237 F.Supp.2d 183, 189 (D. Conn. 2002) (quoting *L&R Realty v. Conn. Nat'l Bank*, 53 Conn. App. 524, 534–35 (1999) (quotations and citations omitted). "[T]he decisive question is the intent of the parties as expressed." *Klein*, 166 Conn. at 80 (1974). "The parties' intent is determined from the (1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 447 (2d Cir. 2005).

"A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." *Audubon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811, 626 A.2d 729 (1993); *see also In re Speer*, 558 B.R. 67, 73 (Bankr. D. Conn. 2016). Importantly, "[p]arties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated." *Sicaras v. Hartford*, 44 Conn. App. 771, 778, 692 A.2d 1290; *see also Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 529, 4 A.3d 288 (2010).

Here, having reviewed all the evidence, it is apparent from the facts and circumstances of this transaction that the minds of the parties had truly met and that an enforceable definitive prepetition accord thus existed. The parties' obligations under the memorialized agreement were clear and customary and the settlement monies were not merely determined but also transferred from the Debtor to its counsel and held in contemplation of an imminent closing. The parties shook hands and reported a settlement to the mediator and the Superior Court, evidencing by a preponderance of the evidence that the terms of the settlement had been agreed to and that the resulting oral agreement was sufficiently definite and enforceable under the standard announced in *Audubon Parking*.

Although NAS had yet to assent to the minor final revisions regarding certain release provisions on its interests, upon review of the Settlement Agreement itself, the proposed revisions drafted did not materially affect the substance of the accord between Nosal and the Debtor. Instead, the revisions were merely incidental

10

as NAS had already assented to the substantive terms of the settlement in full and to the exchange of appropriate related releases. Moreover, any differences were resolved prepetition as the chronology of events before the Chapter 11 filing demonstrate.

In sum, given (1) the clear and unambiguous language of the Settlement Agreement itself, (2) the circumstances surrounding the mediation and its conclusion, and (3) the purposes which the parties sought to accomplish in mediating and resolving their dispute, it is clear that a sufficient meeting of the minds had occurred and an enforceable Settlement Agreement with and by the Debtor had been reached before the Debtor filed its bankruptcy petition.

### 3.2    The settlement funds in escrow were not property of the estate; further, the prospect of an avoidable preference is waivable and in the best interest of the estate and creditors.

The Debtor argues that it "no longer had an equitable interest in the Settlement Funds once they had been put in escrow with counsel for the benefit of [Nosal,]" citing *In re Choate*, 184 B.R. 270 (Bankr. N.D. Tex. 1995). Haynes argues that either the escrowed funds are property of the estate or, if not, constitute an avoidable preference under 11 U.S.C. § 547. Although the Court agrees with the likelihood of Haynes's latter contention, that characterization is not fatal to a Rule 9019 settlement.

The commencement of a bankruptcy case creates an estate comprised of, among other things and with exceptions inapplicable here, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C.

§ 541(a)(1). "A debtor's rights in property for property of the estate purposes are determined by nonbankruptcy (typically state) law." 5 Collier on Bankruptcy ¶ 541.09[1]. "In determining whether assets purportedly held in escrow are property of the estate, many courts begin with the threshold analysis of whether the arrangement presented to the court is in fact a true escrow." *Id.* (footnote omitted).

"An escrow has been defined as a written instrument which by its terms imports a legal obligation and which is deposited by the grantor, promisor, or obligor, or his agent with a stranger or third party, to be kept by the depositary until the performance of a condition or the happening of a certain event, and then to be delivered over to the grantee, promisee, or obligee." *Norwich Lumber Co. v. Yatroussis*, (citing 5 Conn. Cir. Ct. 95, 100, 243 A.2d 311 (1967) (internal quotation marks omitted). "No precise form of words is necessary to create an escrow." 28 Am. Jur. 2d Escrow § 5.

The Settlement Agreement provided for the Debtor to put $150,000 "in escrow with [its] counsel by May 3, 2024." It then provided for Nosal and the Debtor to withdraw the entire Superior Court action, after which the settlement funds would be wired to Nosal. In other words, it met every criteria spelled out in the *Norwich Lumber* case. Given the undisputed intention of the parties to create an escrow, Haynes's contention that there is no separate written escrow agreement is a red herring.[9]

---

[9] Haynes also cites *O'Neil v. Shipman (In re Pratt & Whitney Co.)*, 143 B.R. 19 (Bankr. D. Conn. 1992) in support of its argument that the escrow here is not a true escrow. But that case is distinguishable, where the funds were diverted on the day a bankruptcy petition was filed and the debtor retained exclusive control over the funds' disbursement. Thus, the purpose and nature of the

Notwithstanding that a duly established escrow is not property of the estate, the Debtor made a prepetition payment of its monies to the escrow agent that possibly was an avoidable transfer. Under 11 U.S.C. § 547(b):

> [T]he trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—
>     (1) to or for the benefit of a creditor;
>     (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>     (3) made while the debtor was insolvent;
>     (4) made—
>         (A) on or within 90 days before the date of the filing of the petition; or
>         (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>     (5) that enables such creditor to receive more than such creditor would receive if—
>         (A) the case were a case under chapter 7 of this title;
>         (B) the transfer had not been made; and
>         (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Going through the elements, the Debtor made a transfer of money to the escrow agent for the benefit of Nosal (a creditor by way of its claims against the Debtor) on account of debts owed prior to the transfer and within the 90-day period prepetition while the Debtor was insolvent. Given the undisputed evidence that no distribution would likely occur were this case to convert to Chapter 7, Nosal would clearly receive more from this escrow payment than it would in such a case. The payment

---

escrow here, along with the level of control maintained over it (apparently, none), point towards the escrow here being a true escrow.

to the escrow therefore is potentially avoidable (but not void) as a prepetition preference.[10]

In Chapter 11, 11 U.S.C. § 547(b) gives the Debtor—like a Trustee—discretion concerning whether to seek avoidance of a transfer.[11] *See id.* ("the trustee *may . . .* avoid") (emphasis added). Thus, what the Court is faced with is more nuanced than whether the Settlement Agreement on its face is fair and equitable and within the range of reasonableness. Instead, the calculus to be examined by the Court includes whether the Debtor's foregoing of a preference claim in exchange for Nosal withdrawing its $799,472.57 proof of claim and all sides fulfilling the remaining terms of the Settlement Agreement meets the standards of Rule 9019.

### 3.3    The proposed compromise is fair and equitable and within the range of reasonableness under Fed. R. Bankr. P. 9019.

Having determined that the Settlement Agreement would be enforceable under Connecticut law and that it led to the creation of a true escrow constituting a potential preferential transfer, the Court must now consider whether the exchange of a waiver or release of a preference claim for the withdrawal of Nosal's full claim (and the other attendant consideration in the Settlement Agreement) is consistent with bankruptcy law governing such compromises.

---

[10] In response to the suggestion that the Settlement Agreement reduces Nosal's claim to $150,000, paragraph 1 of the Settlement Agreement contemplates a springback of Nosal's original claim absent full performance of its terms.

[11] The Court's analysis of a potential preference in this context does not assess any potential defenses or the significance of a Chapter 11 Plan that advances a comparable dividend to all creditors so as to blunt the efficacy and necessity of an avoidance action.

Under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure: "On the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement." Rule 9019 "has a clear purpose to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court." *In re Iridium Operating, LLC*, 478 F.3d 452, 461 (2d Cir. 2007) (cleaned up). In determining whether a settlement if fair and equitable, courts in this Circuit look at various interrelated facts and circumstances, which have been delineated as follows:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*Id.* at 462 (cleaned up). The Court's responsibility is "to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness[.]" *In re Nordlicht*, 115 F.4th 90, 115 (2d Cir. 2024) (quoting *In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985)).

Putting the Court's imprimatur on the settlement here would end costly, complex construction-related litigation (with no assurance of a favorable outcome to the Debtor) that was commenced over three years ago without any further

15

expenditure and would resolve Nosal's claim.[12] It assuredly was the product of vigorous arm's length negotiation. Coupled with the Debtor's acknowledgement of the likelihood that Nosal might well prevail on its claim against the Debtor, the first, second, and seventh *Iridium* factors are easily met.

As for the interest of creditors, the settlement averts what the Court projects to be a near inevitable liquidation of the Debtor's business if the litigation continues. It thus provides the opportunity to confirm a plan of reorganization that will benefit creditors. A liquidation of the Debtor after conversion to Chapter 7 would mean no recovery for anyone, dismantling of the Debtor's business, and assuring the loss of jobs and any remaining contract revenues. Moreover, as alluded to above, were the Court to reject the settlement, the Debtor would likely be forced to expend significant money it does not have litigating against Nosal. Those legal fees and costs would be entitled to a priority over prepetition general unsecured claims, including Haynes's. *See* 11 U.S.C. § 507(a)(2).

As noted above, Shoff's projections show that prepetition general unsecured creditors would recover more with approval of the settlement agreement than they would in the scenario where the settlement is rejected and litigation continues[13]— even if the failure to settle the Nosal claim does not sink the case. Haynes's

---

[12] At the November 27, 2024 hearing, in withdrawing his objection, the Subchapter V Trustee surmised that continued litigation among Nosal, NAS, and the Debtor would result in attorney fees far in excess of the $150,000 settlement fund, which would be double the estimate put forth by Shoff in Exhibit 3.

[13] The scenario where the settlement is rejected and litigation does not resume in implausible. Thus, administrative legal fees associated with litigation must be part of the calculus is what a reasonable settlement is.

objection notwithstanding, creditors' and the estate's interests are thus better served by this settlement.

Notably, Haynes is also the only party in interest that does not support the settlement.[14] Although Haynes may have raised weighty arguments for this Court's consideration, Haynes would recover less or nothing if the Debtor is unable to avail itself of the settlement. Its ostensible motives—to exact more favorable or comparable treatment—are best reserved in arguments raised in a Plan confirmation contest. Thus, the third and fourth *Iridium* factors weigh in favor of the settlement.

Concerning the fifth *Iridium* factor, the Court is satisfied with the experience and competency of counsel with regards to the sound business judgment of the Debtor as to the centrality and practicality of the settlement to its reorganization efforts. In examining the Settlement Agreement, the Court has also reliably concluded that it limits the releases for officers and directors to the dispute at issue, thus satisfying the sixth *Iridium* factor.

In sum, all seven factors point in favor of approving the Settlement Agreement, which the Court finds falls well within the range of reasonableness under Rule 9019. Thus, although a likely avoidable preference is essentially being waived, the alternative—unwinding the transaction and allowing more litigation—would, at best, lead to worse recoveries for unsecured creditors and, at worst, lead to a Chapter 7 conversion and no recoveries. The avoidance of the $150,000 transfer to

---

[14] As noted above, the Subchapter V Trustee withdrew his objection on the record of the November 27, 2024 hearing.

the escrow simply would not enhance creditor recoveries. Under the aforesaid circumstances, waiving the preference claim in exchange for an almost $800,000 claim being withdrawn from a daunting claims pool of about $6.6 million is sound. It is indisputably in the best interests of the Chapter 11 estate and its creditors.

### 3.4    The settlement is not an impermissible sub rosa plan.

Haynes also argues that the settlement treats Nosal more favorably than other prepetition unsecured creditors (including Haynes) and therefore violates 11 U.S.C. § 1122 and effectuates a prohibited sub rosa plan. Neither argument is persuasive.

Under 11 U.S.C. § 1122(a), with an exception inapplicable here: "[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

> Although this provision explicitly prohibits the placement of dissimilar claims in the same class, it does not address the issue of whether similar claims must be placed in the same class. The Second Circuit has addressed this concern and held that while it is impermissible for a debtor to form a separate class of unsecured creditors for the sole purpose of obtaining an assenting class of impaired creditors, such separate classification will be allowed where the debtor can provide "credible proof of a legitimate reason for separate classification of similar claims."

*In re Lafayette Hotel P'ship*, 227 B.R. 445, 449 (S.D.N.Y. 1998) (quoting *Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994)).

Although the current iteration of the Debtor's proposed Chapter 11 Plan (ECF No. 184) has all prepetition general unsecured claims classified together, that

18

would not stop the Debtor from separately classifying some of the general unsecured creditors for differential treatment in future versions, assuming the Debtor could justify such a classification. Indeed, discussions between the Court, the Debtor, the U.S. Trustee, and other parties in interest during the November 27, 2024 hearing made it clear that an alternate Chapter 11 Plan might indeed reclassify a creditor due to the differences in its claim and putative rights in the settlement from those of other unsecured creditors.

Haynes's sub rosa plan argument similarly relies on claims of unequal treatment. In support of its argument, Haynes cites *In re Miami Metals I, Inc.*, 603 B.R. 531 (Bankr. S.D.N.Y. 2019), which states: "It is well-established that courts may not approve settlements that have the effect of a sub rosa plan and accomplish an end run around the protection granted creditors in Chapter 11 of the Bankruptcy Code." *Id.* (quoting *In re Biolitec, Inc.*, 528 B.R. 261, 272 (Bankr. D.N.J. 2014)). The question then is whether unequal treatment alone constitutes a sub rosa plan.

"A sub rosa plan is one where a [C]hapter 11 debtor constructs a broad settlement that amounts to a de facto plan of reorganization, which enables a debtor to structure its debt while bypassing many of the Bankruptcy Code's fundamental creditor protections." *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015). In effect, a sub rosa plan "establish[es] the terms of the plan[.]" *In re Brainiff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

*Miami Metals* and *Biolitec* were both concerned with debtors that were attempting to use a settlement to effectuate *final* distributions. *See Miami Metals*,

19

603 B.R. at 536 ("a key feature of the Settlement is execution of the Plan Support Agreement"); *Biolitec*, 528 B.R. at 266 ("The Trustee's proposed Order seeks to approve the terms of a settlement between the Trustee and AngioDynamics pursuant to Bankruptcy Rule 9019 and a structured dismissal of the case pursuant to sections 105(a), 1112(b) and 305(a)."). The problem, then, is not with compromises made in the middle of a bankruptcy case, but those that end them. *Cf. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464, 468–69 (2017) (citing *Brainiff Airways* and *Biolitec* with approval in determining that a bankruptcy court cannot "approve a structured dismissal that provides for distributions that do not follow ordinary priority rules without the affected creditors' consent").

Here, neither *Miami Metals* nor its predecessors apply because the settlement does not dictate the terms of the Debtor's Chapter 11 Plan or lead to an inevitable distribution that ends the case. In contrast, the uncontradicted evidence demonstrates that the settlement will facilitate a reorganization plan and the failure to settle will instead likely lead to conversion (and no distribution). Notably, the U.S. Trustee has not advanced any argument that this settlement offends the priority mandates of *Jevic*. Accordingly, the Court rejects the argument that the settlement is a prohibited sub rosa plan.

### 4. Conclusions

After thorough review of the record and arguments in this case and the dockets of the Superior Court of Connecticut and the United States District Court for the District of Connecticut, during and after multiple hearings before this Court,

for the reasons stated above, the Court GRANTS the Motion to Approve Settlement Agreement. The Settlement Agreement is APPROVED and the Debtor and other parties to it, including the escrow agent, are authorized and directed to fulfill their obligation under it.[15]

IT IS SO ORDERED at Hartford, Connecticut this 17th day of December 2024.

James J. Tancredi
United States Bankruptcy Judge
District of Connecticut

---

[15] The Interim Order (ECF No. 238) provided that the period to appeal or seek reconsideration was to be extended until fourteen (14) days after the docketing of this Memorandum of Decision and that various other motions were denied as moot. The Court reaffirms those parts of the Interim Order.